

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-25-00020-CV
_____

DENEA HUDMAN, Appellant

V.

RANDY C. DUNN, Appellee

On Appeal from the 402nd District Court
Wood County, Texas
Trial Court No. 2020-297A

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice van Cleef

# MEMORANDUM OPINION

Denea Hudman sued the mayor of the City of Quitman, Texas, Randy C. Dunn, after he read the personal emails she left on a City computer. The emails ultimately led to Hudman's removal as the executive director of the Quitman Development Corporation (QDC), a corporation under the control of the City that obtained funding through sales tax allocations to attract new businesses to Quitman. Dunn moved for and was granted summary judgment on the ground that he was entitled to official immunity, among other things.

Hudman appeals, arguing that genuine issues of material fact precluded the trial court's entry of summary judgment against her. Because we determine that Dunn established entitlement to judgment as a matter of law on his affirmative defense of official immunity, we affirm the trial court's judgment.

## I.      Factual and Procedural Background[1]

In addition to Hudman and Dunn, members of the QDC Board of Directors included its president, Martha Scroggins, and Brad Medlin, Kevan Burroughs, and Steve Straznicky. Hudman had a verbal contract with the City to serve the QDC as an independent contractor. The QDC Board was aware that Hudman was a local realtor but allowed her to serve on the "hard fast rule that [she] would never collect commissions on commercial real estate transactions" within the city limits to prevent any conflict of interest.

It is undisputed that Hudman was not a City employee. Accordingly, "Hudman did not have access to confidential City information such as customer data, financial information, or

---

[1]We recite the facts as they appear in the summary judgment evidence.

2

governmental records." For that reason, the City provided certain administrative services to the QDC, including "[g]eneral administrative support services" and "[s]hared office space and equipment." The QDC paid an annual fee for building space provided by the City in an annex next to city hall, which housed QDC computers. The QDC also provided Hudman with her own email account that could be used for QDC business. Even so, according to Rodney Kieke, the City secretary/administrator, "Hudman frequently used her [personal] Gmail account to communicate with [him] concerning QDC business dealings, including the funding of QDC projects."

As the QDC's executive director, Hudman was "responsible for the QDC's day-to-day business activities and operations." Those responsibilities included closing on commercial properties. Dunn testified that, during a closing, he mentioned to Hudman that it was a good day and joked that "the only thing that would make it better [was] if [Hudman] got paid a commission." According to Dunn, "[Hudman] winked at me . . . and said, but I've got a pretty good equity in a partnership." According to Dunn, Hudman admitted that she was a partner in the Colonial Real Estate Company along with Jamie Wyatt. Dunn was "surprised" by that admission since Hudman was not supposed to be compensated on sales of commercial property inside the Quitman city limits.

On January 20, 2020, a QDC Board meeting was held at city hall. The board excused Hudman from the meeting so they could discuss QDC's working arrangement with her and the possibility of providing her with a written contract during an executive session. Hudman testified that, in the evening, instead of going to the annex to use the QDC computers, she went

to the city hall after business hours to use a City computer located at the desk of Amber Highnote, the City's utility clerk. Because she was not a City employee, Hudman said she logged on as a guest. She admitted that, instead of using her QDC email, Hudman used the internet to log on to her personal Gmail account, printed off agendas that she had previously emailed to herself, and left without logging out of her personal email.

The next morning, Sheryl Laudenslager, a City employee, received a phone call from a water utility customer and logged onto Highnote's computer to obtain information needed to answer the customer's question. When she did so, Laudenslager noticed Hudman's email open on the computer screen and reported it to Kieke. According to Kieke, Hudman did not have the password or permission to access the City's computers. But, when Kieke went to Highnote's computer, he saw Hudman's personal Gmail account open. Kieke became concerned and contacted Dunn to investigate.

After business hours, Dunn went to Highnote's computer and saw Hudman's Gmail account was both open and logged into. Dunn "had concerns" because of Hudman's comment about equity in a partnership and "felt like [he] needed to check on some things." Dunn admitted that he searched Hudman's Gmail for the word "partnership" and located emails showing that Hudman was a partner of JBRPM d/b/a Colonial Realty and Development, which had been given business during QDC closings.[2] According to Kieke, "Messages on the open Gmail account were identified which indicated that Ms. Hudman was being paid commissions on City Property sold by Colonial Development in violation of her agreement with the QDC. This also involved a

---

[2]JBRPM, LLC d/b/a Colonial Realty and Development, a/k/a Colonial Construction and Realty, LLC (Colonial) and Wyatt intervened in the litigation, but their claims were severed, and they are not a party to this appeal.

4

possible misuse or misappropriation[] of City funds." Kieke also stated that he became aware that one property that was supposed to remain the QDC's property was somehow conveyed to Colonial, in which Hudman had an interest. On the advice of the city attorney, Dunn and Kieke informed the QDC of the messages in Hudman's Gmail account.

To address the issue, the QDC held an executive session. Scroggins distributed a packet of documents to each QDC member that contained "series of e-mails between Jamie Wyatt, John Miller, and Denea Hudman," showing that Hudman was referenced as the "new partner." According to Burroughs,

> The e-mails also referenced a "capital contribution," and an "equity commitment" made by Denea Hudman. The fourth page [wa]s a financial spreadsheet showing several columns. One of the columns [wa]s titled "Total Commissions." Commissions for various real estate transactions appear to be calculated for the spreadsheet. Several of the listed transactions involve economic development property in Quitman in which it appears that Denea Hudman represented Mr. Wyatt or his business Colonial Construction and Realty, LLC. Many of these transactions list an equity interest for Ms. Hudman.

That information surprised several board members.

Dunn and Burroughs both said that the QDC Board emphasized to Hudman that taking a commission or other compensation on QDC transactions while working as executive director of the QDC would constitute a conflict of interest and that, as a result, Hudman had repeatedly assured the QDC Board that she was not making any commissions on commercial transactions within the city limits. Burroughs said that Hudman had told him several times that "she was not making a penny on this commercial real estate." Yet, according to Burroughs and Medlin, Hudman never openly disclosed to the board that she was a business partner with Wyatt or that she was in the process of purchasing a partnership interest or owned any partnership interest with

5

Wyatt in Colonial. Because several QDC board members and Kieke saw Hudson's "involvement with the partnership and the QDC, which was contributing funds to the partnership in a development effort," as a conflict of interest, the QDC Board gave Hudman the option to resign. The QDC later voted unanimously to terminate Hudman's contract.

Hudman admitted that she was a fifty-percent shareholder of Colonial, along with Wyatt, and had been a partner and part owner of Colonial since 2018. "In [her] role with Colonial, [she was] responsible for real estate development and acquisitions." Although no money exchanged hands, Hudman admitted that she was credited for equitable contributions in the business.

Upset that Dunn had read her personal email, Hudman sued Dunn for conversion, theft, business disparagement, intrusion upon seclusion, tortious interference, defamation and defamation per se, intentional infliction of emotional distress, and violation of due process. Hudman also asserted a civil cause of action against Dunn for "knowingly access[ing] a computer . . . without the effective consent of the owner," even though the computer he accessed was a City computer. TEX. PENAL CODE ANN. § 33.02; *see* TEX. CIV. PRAC. & REM. CODE ANN. § 143.001.

Dunn's answer raised the affirmative defense of official immunity. After adequate time for discovery, Dunn filed a traditional motion for summary judgment arguing that he was entitled to official immunity.[3] The trial court agreed and granted summary judgment in Dunn's favor.

---

[3]Dunn also filed a no-evidence motion related to most, but not all, of Hudman's claims.

## II. Standard of Review

"A party that moves for traditional summary judgment must demonstrate that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law." *Energen Res. Corp. v. Wallace*, 642 S.W.3d 502, 509 (Tex. 2022) (citing TEX. R. CIV. P. 166a(c)). Our review of a summary judgment "is de novo, and we view the evidence in the light most favorable to the nonmovants by indulging every reasonable inference and resolving any doubts in their favor." *City of Houston v. Rodriguez*, 704 S.W.3d 462, 470 (Tex. 2024). That said, "we do not disregard necessary contextual evidence or 'evidence and inferences unfavorable to the [nonmovants] if reasonable jurors could not.'" *Id.* (alteration in original) (quoting *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 771 (Tex. 2018)). "Once the movant produces evidence entitling it to summary judgment, the burden shifts to the nonmovant to present evidence raising a genuine issue of material fact." *Coniglio v. Woods*, 693 S.W.3d 44, 50 (Tex. App.—Texarkana 2022, pet. denied) (quoting *Polecat Hill, LLC v. City of Longview*, 648 S.W.3d 315, 330 (Tex. App.—Texarkana 2021, no pet.) (citing *Walker v. Harris*, 924 S.W.2d 375, 377 (Tex. 1996))). "The evidence raises a genuine issue of fact if reasonable and fair-minded jurors could differ in their conclusions in light of all the summary judgment evidence." *Id.* (quoting *Delta Cnty. Appraisal Dist. v. PPF Gin & Warehouse, LLC*, 632 S.W.3d 637, 641 (Tex. App.—Texarkana 2021, pet. denied)).

## III. Dunn Was Entitled to Official Immunity

Hudman argues that the trial court erred by concluding that Dunn established his entitlement to summary judgment because of official immunity as a matter of law. "Official

immunity is an affirmative defense . . . afforded to [a] government employee." *City of Mesquite v. Wagner*, 712 S.W.3d 609, 613 (Tex. 2025) (per curiam) (citation omitted). It protects an officer or employee of a governmental entity from liability "when they are performing (1) discretionary duties, (2) in good faith, and (3) within the scope of their authority." *Id.* (quoting *Rodriguez*, 704 S.W.3d at 468).

When these conditions are met, an "officer or employee . . . is entitled to official immunity even though his acts are negligent or against the governmental entity's regulations or policy." *Titus Reg'l Med. Ctr. v. Tretta*, 180 S.W.3d 271, 274 (Tex. App.—Texarkana 2005, no pet.) (citing *City of Lancaster v. Chambers*, 883 S.W.2d 650, 655 (Tex. 1994)). That is because "official immunity is based on the necessity of public officials to act in the public interest with confidence and without the hesitation that could arise from having their judgment continually questioned by extended litigation." *Ballantyne v. Champion Builders, Inc.*, 144 S.W.3d 417, 424 (Tex. 2004) (citing *Kassen v. Hatley*, 887 S.W.2d 4, 8 (Tex. 1994)). "The public would suffer if government officials, who must exercise judgment and discretion in their jobs, were subject to civil lawsuits that second-guessed their decisions." *Id.* (quoting *Kassen*, 887 S.W.2d at 8). Consequently, official immunity protects good-faith mistakes by public officials. *Rodriguez*, 704 S.W.3d at 468. In a car chase case where "only the good-faith element of the official-immunity defense was at issue," *id.* at 470, the court held that "[t]he doctrine promotes the public good by encouraging energetic law enforcement and allowing officers to make good-faith, split-second judgments based on their experience and training without fear of liability for every mistake," *id.* at 468. Starting with the scope of authority requirement, "[a]

8

person acts within the scope of his authority if he is discharging the duties assigned to him." *Tretta*, 180 S.W.3d at 275. "The fact that an act that forms the basis of a suit was performed improperly or negligently does not take it outside the actor's scope of authority." *Id.* (citing *Chambers*, 883 S.W.2d at 658 & n.9). "The mayor is the chief executive officer of the municipality." TEX. LOC. GOV'T CODE ANN. § 22.042(a). As mayor, Dunn was charged with the duty to "give to the governing body any information . . . that relate[d] to . . . good government of the municipality," TEX. LOC. GOV'T CODE ANN. § 22.042(c), and to "actively ensure that the laws and ordinances of the municipality [were] properly carried out," TEX. LOC. GOV'T CODE ANN. § 22.042(a). That included enforcement of the City's regulations for use of its equipment, which provided that "City property and equipment shall be used for City business and public purposes only,"[4] as well as possible misappropriation of the City's funds and conflict-of-interest laws pertaining to the QDC.[5]

Kieke told Dunn that Hudman used a City computer without proper access even though she was not a City employee. The City's regulations provided, "Electronic communications stored on its system are the [C]ity's property." When Dunn went through Hudman's open Gmail account, it was for the purpose of investigating whether City funds were spent in Hudman's benefit or in any manner that could be considered a conflict of interest between her partnership interest and her position as the QDC's executive director. Because Dunn was the City's chief

---

[4]The City used Microsoft Outlook for its emails, and the server was hosted by People's Communication, a private network company. According to Kieke, there was no reason for a Gmail account to be on a City computer.

[5]Section 22.230 of the Texas Business Organizations Code contains conflict of interest laws pertaining to directors, officers, and members of a corporation. TEX. BUS. ORGS. CODE ANN. § 22.230 (Supp.).

executive officer, we find that Dunn's actions in searching electronic communications left available on the City's computer was within the scope of his authority.

Next, we decide whether Dunn's actions were discretionary or ministerial. "If a duty involves personal deliberation, decision, and judgment, it is a discretionary duty. Acts that require specific obedience to orders that must be performed with such precision and certainty that nothing is left to the exercise of discretion or judgment, are ministerial." *Tretta*, 180 S.W.3d at 275 (citing *Kassen*, 887 S.W.2d at 9; *Chambers*, 883 S.W.2d at 653–54). We have previously held that "[e]xecutives and supervisors of State entities have uniquely discretionary authority," *id.*, and that those "who conduct or supervise investigations for State entities are performing discretionary acts," *id.* (citing *Heikkila v. Harris Cnty.*, 973 S.W.2d 333, 336 (Tex. App.—Tyler 1998, pet. denied)). This is because "[a] state employee who 'is required to pass on facts and determine his actions by the facts found is performing duties that are "quasi-judicial" in nature and are discretionary.'" *Heikkila*, 973 S.W.2d at 336 (quoting *Lazaro v. Univ. of Tex. Health Sci. Ctr.*, 830 S.W.2d 330, 332 (Tex. App.—Houston [14th Dist.] 1992, writ denied)). We see no reason why the same rationale should not apply to executives and supervisors of municipalities. As a result, we conclude that Dunn's decision to investigate a possible violation of the City's computer policy, misappropriation of City funds, and conflict of interest was a discretionary act in connection with his general supervisory authority as the City's chief executive officer. *See Tretta*, 180 S.W.3d at 276.

As for the last requirement, "[g]ood faith in official immunity cases must be measured against a standard of objective legal reasonableness, without regard to the official's subjective

state of mind." *Id.* "This test of good faith does not inquire into 'what a reasonable person *would have done,*' but into 'what a reasonable [person] *could have believed.*'" *Ballantyne*, 144 S.W.3d at 426 (alteration in original) (quoting *Telthorster v. Tennell*, 92 S.W.3d 457, 465 (Tex. 2002)). Notably, "[t]o show good faith" in the context of a city board's decision regarding a construction permit, the Texas Supreme Court did "not require the [board] members' [permit decision] to be legally correct, only colorable." *Id.* at 419, 426. Consequently, we need not and do not speak definitively to the legal correctness of Dunn's search of Hudman's open Gmail account under the circumstances of Dunn's search. *See id.*

Here, Hudman had previously indicated to Dunn that she had a potential conflict of interest due to her equity in a partnership. Keike reported to Dunn that Hudman had accessed a City computer without permission. The City's regulations provided that, because electronic communications on City computers were City property, even "employees should not assume such communications to be private." Dunn could have believed that Hudman had no expectation of privacy of her Gmail account she left open on the City computer because of City regulations and that evidence of her partnership interest was memorialized in her emails. Dunn had a choice of whether to search Hudman's email and, given the information he knew before the investigation, could have believed that doing so was in the City's best interest. As a result, we find that Dunn's investigation was conducted in good faith, as that term is defined in the cases above. *See, e.g.*, *id.* at 426.

From the evidence attached to his summary judgment motion, Dunn established that his investigation was within the scope of his authority as mayor and was a discretionary duty

11

performed in good faith. As a result, Hudman had to raise a genuine issue of material fact as to these three elements to preclude the summary judgment. As to the scope of Dunn's authority, Hudman argues that Dunn never contacted her to explain what he found during the search and that he simply must have had a personal vendetta against her, but those arguments do not negate Dunn's duty to investigate violations of City policy, possible misappropriation of City funds, or conflict of interest. As for whether Dunn's acts were discretionary, Hudman makes a conclusory argument that "[t]here is nothing about Dunn's actions in accessing Hudman'[s] personal Gmail account . . . which could be considered a discretionary duty in his office as mayor," but we have explained why the act was discretionary. Lastly, "[t]o avoid summary judgment on the issue of good faith, [Hudman] must have produced objective summary judgment evidence from a qualified witness who, after reviewing the facts, conclude[d] that no reasonable person in [Dunn's] position could have believed [Dunn's] actions were justified." *Tretta*, 180 S.W.3d at 276. Hudman presented no such evidence. Even if Hudman had presented evidence of negligence by Dunn, "evidence that he 'may have acted negligently, or did not consider and assess all possible subsidiary alternatives,' is not sufficient to overcome proof of good faith." *Wagner*, 712 S.W.3d at 615 (quoting *City of Houston v. Sauls*, 690 S.W.3d 60, 79 (Tex. 2024)).

We hold that Dunn presented adequate evidence to establish that he was protected by official immunity when conducting his investigation, which Hudman's summary judgment evidence failed to controvert. As a result, even when viewing the evidence in a light most favorable to Hudman, we conclude that the trial court's summary judgment was proper.

12

## IV.   Conclusion

We affirm the trial court's judgment.

Charles van Cleef
Justice

Date Submitted:   November 4, 2025
Date Decided:     November 13, 2025